# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                                      )
ELECTRONIC PRIVACY INFORMATION CENTER, )
                                                      )
        Plaintiff,                                 )
                                                      )
        v.                                         ) Case No. 1:09-cv-02084 (RMU)
                                                      )
THE UNITED STATES DEPARTMENT OF          )
HOMELAND SECURITY,                            )
                                                      )
        Defendant.                                 )
_____ )

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant United States Department of Homeland Security hereby moves the Court to enter summary judgment in Defendant's favor pursuant to Rule 56(b) of the Federal Rules of Civil Procedure. Attached in support of this motion are a statement of material facts not in dispute, a memorandum of points and authorities, the Declaration of Kevin J. Janet and attached exhibits, the Declaration of Mark Roberts, and a proposed Order.

Date: May 27, 2010

Respectfully submitted,

TONY WEST
Assistant Attorney General

RONALD C. MACHEN JR.
United States Attorney for
the District of Columbia

ELIZABETH J. SHAPIRO
Deputy Branch Director

/s/ Jesse Z. Grauman
JESSE Z. GRAUMAN (Va. Bar No. 76782)
U.S. Department of Justice

Civil Division, Federal Programs Branch

<u>Mailing Address:</u>
Post Office Box 883
Washington, D.C.  20044

<u>Courier Address:</u>
20 Massachusetts Ave., N.W.
Washington, D.C. 20001

Telephone:      (202) 514-2849
Fax:            (202) 616-8460
Email:          jesse.z.grauman@usdoj.gov

Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on May 27, 2010, I electronically filed Defendant's Motion for

Summary Judgment, and all attachments, through the Court's CM/ECF system, which will send

notification of such filing to the following individuals:

> John Arthur Verdi
> Electronic Private Information Center
> 1718 Connecticut Avenue, NW
> Washington, DC  20009
> Phone: (202) 483-1140
> Email: verdi@epic.org

> Marc Rotenberg
> Electronic Private Information Center
> 1718 Connecticut Avenue, NW, Suite 200
> Washington, DC 20009-1148
> (202) 483-1140, ext 106
> Email: rotenberg@epic.org

/s/ Jesse Z. Grauman<br>
Jesse Z. Grauman<br>
Trial Attorney

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
)
ELECTRONIC PRIVACY INFORMATION CENTER, )
)
            Plaintiff,                  )
)
         v.                      ) Case No. 1:09-cv-02084 (RMU)
)
THE UNITED STATES DEPARTMENT OF    )
HOMELAND SECURITY,             )
)
            Defendant.          )
_____ )

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

      Plaintiff Electronic Privacy Information Center ("EPIC") has sued Defendant Department of Homeland Security ("DHS") under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), for agency records concerning a new screening technology, known as Advanced Imaging Technology ("AIT") or whole body imaging ("WBI"),[1] that is being employed at airports in the United States by DHS' component, the Transportation Security Administration ("TSA").  Because DHS has conducted an adequate search and produced all responsive documents that are not exempt from release under FOIA, summary judgment should be granted in Defendant's favor.

## FACTUAL AND PROCEDURAL BACKGROUND

### EPIC's FOIA Requests.

      EPIC's first request, made on April 14, 2009 (the "April 14 Request"), requested:

---

[1] These terms are essentially synonymous.  Janet Decl. ¶ 15 n. 1.  This brief will generally use the term "AIT."

1. All documents concerning the capability of passenger imaging technology to obscure, degrade, store, transmit, reproduce, retain, or delete images of individuals;

2. All contracts that include provisions concerning the capability of passenger imaging technology to obscure, degrade, store, transmit, reproduce, retain, or delete images of individuals; and

3. All instructions, policies, and/or procedures concerning the capability of passenger imaging technology to obscure, degrade, store, transmit, reproduce, retain, or delete images of individuals.

Declaration of Kevin J. Janet ("Janet Decl.") ¶ 4 & Ex. A.  EPIC requested expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E), and preferential fee status as a "representative of the news media" pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II).  Id.

Upon review, DHS determined that the information sought by EPIC in the April 14 Request was under the purview of DHS' component, TSA, and accordingly transferred the requests to TSA.  Id.  TSA received the referral from DHS on April 27, 2009.  Id.  By letter to EPIC dated April 29, 2009, DHS acknowledged the Request and informed EPIC of the referral. Id. ¶ 5 & Ex. B.

EPIC's second request, made on July 2, 2009 (the "July 2 Request"), requested:

1. All unfiltered or unobscured images captured using Whole Body Imaging Technology.

2. All contracts entered into by DHS pertaining to Whole Body Imaging systems, including contracts for hardware, software, or training.

3. All documents detailing the technical specifications of Whole Body Imaging hardware, including any limitations on image capture, storage, or copying.

4. All documents, including but not limited to presentations, images, and videos, used for training persons to use Whole Body Imaging systems.

5. All complaints related to the use of Whole Body Imaging and all documents relating to the resolution of those complaints.

6. All documents concerning data breaches of images generated by Whole Body Imaging technology.

Janet Decl. ¶ 7 & Ex. C.  EPIC again requested expedited processing and "news media" fee

status.  Id.  On July 16, 2009, DHS referred the July 2 Request to TSA, id., and sent EPIC a letter

acknowledging the request and informing EPIC of the referral, id. ¶ 8 & Ex. D.

On November 5, 2009, EPIC filed an action in this Court, Civil Action No. 1:09cv2084

("EPIC v. DHS I"), alleging that DHS had violated FOIA with regard to the April 14 Request

and asking the Court to order DHS to produce the requested documents.  Compl. ¶ 32 &

Requested Relief, ¶ B.  In the Complaint, EPIC also requested that the Court adjudicate its

request for "news media" fee status and order that all fees be waived.  Compl., Requested Relief,

¶ C.  On January 13, 2010, EPIC filed a second action in this Court, 1:10cv63 ("EPIC v. DHS

II"), alleging that DHS had violated FOIA with regard to the July 2 Request and requesting

similar relief.  Compl., EPIC v. DHS II, ¶ 34 & Requested Relief, ¶ B.  Due to the overlapping

subject matter of the two requests and cases, on March 11, 2010, the parties jointly moved to

consolidate the actions (Dkt. No. 16), and on March 17, 2010, the Court granted the motion and

ordered the actions consolidated.

Agreements as to scope

TSA and EPIC have made a number of agreements as to the scope of EPIC's two

requests.  On May 4, 2009, TSA and EPIC agreed that with respect to the second item in EPIC's

request – "[a]ll contracts" for passenger imaging technology – TSA would focus its search on

records that defined the scope of work, operational requirements and any subsequent

modifications thereto.  Janet Decl. ¶ 6.  By doing so, TSA eliminated a process wherein it would

have to consider contractors' claims of confidential business information and potentially assert

the FOIA exemption in 5 U.S.C. § 552(b)(4).  Id.

On March 3, 2010, TSA and EPIC came to four additional agreements as to the scope of

EPIC's requests.  They agreed that: (1) The requests do not seek the release of communications or deliberations; (2) DHS and TSA would treat Item No. 2 in the July 2 Request, seeking "All contracts entered into by DHS pertaining to WBI systems, including contracts for hardware, software or training," as identical to Item No. 2 in the April 14 Request, seeking "All contracts that include provisions concerning the capability of passenger imaging technology to obscure, degrade, store, transmit, reproduce, retain, or delete images of individuals;" (3) Regarding Item No. 3 in the July 2 Request, seeking "All documents detailing the technical specifications of WBI hardware, including any limitations on image capture, storage or copy," if DHS were to locate any technical specifications for WBI hardware that do not relate to image capture, storage, or copy, it would produce those specifications if they were part of a larger document that includes specifications that relate to image capture, storage, or copy.  If DHS were to find standalone specifications for the machines that are unrelated to image capture, storage, or copy, DHS would discuss these documents with EPIC to determine whether EPIC seeks such documents; (4) in Item No. 6 in the July 2 Request, "data breaches" refers to any instances of unauthorized access to, or distribution of, the images generated by WBI technology. See Janet Decl. ¶ 12 & Ex. G.

TSA's Production of Documents

TSA produced its initial set of documents responsive to the April 14 Request on December 1, 2009.  Janet Decl. ¶ 9 & Ex. E.  Pursuant to an agreed-upon schedule (Dkt. No. 15), TSA has since produced additional sets of documents responsive to the two requests on March 2, 2010, March 15, 2010, and April 15, 2010.  Janet Decl. ¶¶ 11, 13, 14 & Exs. F, H, I.

In response to EPIC's two requests, TSA has produced a total of 1,766 pages of documents.  Janet Decl. ¶ 15.  TSA also located 2,000 test images, and 376 pages of training

documents, that it withheld in full.  Id.  The material withheld in full or in part was withheld

pursuant to the exemptions established by 5 U.S.C. § 552(b)(2), (b)(3), (b)(4), (b)(5), (b)(6), and

(b)(7).  Id.

Pursuant to TSA's letter of March 15, 2010, all fees have been waived for EPIC with

regard to the two requests.  Janet Decl. ¶ 13 & Ex. H.  Accordingly, the only two issues

remaining for the Court's review at summary judgment are the sufficiency of the search that was

conducted, and the propriety of certain exemptions asserted as the basis for withholding portions

of the responsive documents.

Agreements as to Exemptions

On May 18, 2010, TSA, through undersigned counsel, provided EPIC with a draft

Vaughn index detailing all documents and excerpts withheld by TSA pursuant to FOIA

exemptions.  Janet Decl. ¶ 16.  Later on that day, in a conference call, EPIC agreed not to contest

certain withholdings, namely,

(1) All withholdings of confidential business information pursuant to Exemption 4, as
    well as any withholdings of similar information deemed outside the scope of EPIC's
    requests pursuant to the May 4, 2009 phone agreement;
(2) All withholdings of names, phone numbers, email addresses, IP addresses, ID
    numbers, and similar trivial and/or personally identifying information, for both
    government and non-government individuals, made pursuant to Exemptions 2, 6, and
    7; and
(3) The withholding of two excerpts pertaining to "mean downtime requirements," made
    pursuant to Exemption 2 (high).

Id. & Ex J.  As a result of this agreement, the only withholdings that remain at issue between the

parties are:

(1)   All withholdings made pursuant to Exemption 3;
(2)   All withholdings made pursuant to Exemption 2 (high) except those covered by the
      above agreement;
(3)   All withholdings made pursuant to Exemption 5; and
(4)   Two withholdings made pursuant to Exemption 4 that were outside the scope of
      the above agreement.

Id. ¶¶ 16-19 & Exs. J, K.[2]  This memorandum, and the attached declarations and Vaughn Index, accordingly address only these withholdings, as well as the sufficiency of the search by TSA and DHS.

>  Re-production of documents erroneously redacted

Upon reviewing the records in preparation of the instant motion, TSA recognized that eight redactions in the documents produced to EPIC were erroneously made.  Janet Decl. ¶ 18.  TSA therefore produced the documents without these redactions on May 27, 2010.  Id. ¶ 18 & Ex. L.

## **STANDARD OF REVIEW**

Summary judgment is appropriate when the there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  FOIA actions are typically resolved on summary judgment.  Reliant Energy Power Generation, Inc. v. FERC, 520 F. Supp. 2d 194, 200 (D.D.C. 2007).  A court reviews an agency's response to a FOIA request de novo. See 5 U.S.C. § 552(a)(4)(B).

---

[2] Subsequent to the above-described agreement, Defendant recognized that it had inadvertently omitted ten partial withholdings from the draft Vaughn index that was submitted to EPIC on May 18.  Janet Decl. ¶ 17.  Defendant, through undersigned counsel, informed EPIC that it would fully brief these withholdings at summary judgment.  Id. & Ex. K.  Two of these withholdings, Bates No. 001715, were made pursuant to Exemption 4.  Id. Ex. K.  Although EPIC had agreed not to contest any of the Exemption 4 withholdings on the draft Vaughn index, because all of the Exemption 4 withholdings on the draft Vaughn index concerned pricing and quantity data and vendor identifying information, whereas the withholdings on Bates No. 001715 concern a different type of confidential business information, Defendant has construed the withholdings on Bates No. 001715 as outside the scope of the May 18 agreement and explains those withholdings below and in its declarations.  Id.  In short, this memorandum and the attached declarations explain the basis for any withholdings that were inadvertently omitted from the draft Vaughn index.

On summary judgment in a FOIA case, the agency must demonstrate that it has conducted an adequate search.  To do so, it must explain the "scope and method of the search" in "reasonable detail[,]" but need not provide "meticulous documentation [of] the details of an epic search."  Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982).  The agency must show "that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." Oglesby v. U.S. Dep't of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990). "There is no requirement that an agency search every record system."  Id.  Rather, "the issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate."  Weisberg v. U.S. Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (emphasis in original).  On this issue, courts accord agency affidavits "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).

The agency must also justify any records withheld subject to FOIA's statutory exemptions.  FOIA "represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential." Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 925 (D.C. Cir. 2003).  As such, while the statute "affords the public access to virtually any federal government record that FOIA itself does not specifically exempt from disclosure," Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec., 384 F. Supp. 2d 100, 106 (D.D.C. 2005), Congress recognized "that legitimate governmental and private interests could be harmed by release of certain types of information

and provided nine specific exemptions under which disclosure could be refused." FBI v.

Abramson, 456 U.S. 615, 621 (1982).  These exemptions are specified in 5 U.S.C. § 552(b).

The agency has the burden of justifying nondisclosure based on any exemptions.  Elec.

Privacy Info. Ctr., 384 F. Supp. 2d at 106.  It may meet this burden by providing affidavits and,

if necessary, an index that provides an adequate description of each withheld document or

portion thereof, and how each asserted exemption applies.  Id. (citing Vaughn v. Rosen, 484 F.2d

820 (D.C. Cir. 1973)).  A court may grant summary judgment to an agency on the basis of its

affidavits if they "(a) describe the documents and the justifications for nondisclosure with

reasonably specific detail, (b) demonstrate that the information withheld logically falls within the

claimed exemption, and (c) are not controverted by either contrary evidence in the record nor by

evidence of agency bad faith."  Id. (quoting Military Audit Project v. Casey, 656 F.2d 724, 738

(D.C. Cir. 1981)) (internal quotation marks and brackets omitted).

In the context of documents that implicate national security, courts typically give

particular deference to agency declarations regarding the use of FOIA exemptions to withhold

documents.  See Krikorian v. Dep't of State, 984 F.2d 461, 464 (D.C. Cir. 1993) (noting

deference to expertise of agencies engaged in national security and foreign policy). "[A]

reviewing court 'must take into account . . . that any affidavit or other agency statement of

threatened harm to national security will always be speculative to some extent, in the sense that it

describes a potential future harm.'" Wolf v. CIA, 473 F.3d 370, 374 (D.C. Cir. 2007) (quoting

Halperin v. CIA, 629 F.2d 144, 149 (D.C. Cir. 1980)) (omission in original). "Ultimately, an

agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or

'plausible.'" Id. at 374-75.

## ARGUMENT

## I. TSA CONDUCTED AN ADEQUATE SEARCH FOR RESPONSIVE DOCUMENTS.

As outlined in the attached Declaration of TSA FOIA Officer Kevin J. Janet, DHS conducted an adequate search that was "reasonably expected to produce the information requested." Oglesby, 920 F.2d at 68.  Upon initial receipt of each of EPIC's requests, both of which referred explicitly to TSA and its employment of WBI technology, DHS referred the requests to TSA.  Janet Decl. ¶¶ 4, 7.  TSA then undertook a search of the divisions within TSA and DHS that were identified as likely to have responsive records.  Id. ¶¶ 20-29.  These offices included the DHS Transportation Security Laboratory, TSA's Office of Security Technology, Office of Acquisitions, Office of Operational and Technical Training, TSA Contact Center, Office of Legislative Affairs, Privacy Office, and the Federal Security Director Offices for those airports using AIT technology.  Id.  ¶ 20.  Each office performed manual as well as electronic searches, the specifics of which are set forth in paragraphs 22 through 29 of the Janet Declaration.

Each office searched was selected based on its likelihood to have records responsive to EPIC's specific requests.  For example, the Office of Security Technology was selected because its Passenger Screening Program focuses on the implementation of checkpoint security equipment, id. ¶ 22, whereas DHS' Transportation Security Laboratory was selected because it was charged with accrediting and testing AIT and stored AIT test images, id. ¶ 23.  Similarly, TSA searched the TSA Contact Center and the individual Federal Security Director Offices because these offices handle public inquiries and complaints.  Id. ¶¶ 26-27.  The searches done were tailored to the offices and records at issue; the Office of Acquisitions, for example, conducted both paper and computerized searches by contract number, id. ¶ 24, while the TSA

Contact Center conducted a computerized search using terms commonly associated with AIT, id. ¶ 26.

In total, TSA produced 1,766 pages, either in full or in part, responsive to the two requests, and located 376 pages and 2,000 test images that were withheld in full.  Id. ¶ 15.  Its searches were reasonably expected to produce the information requested.  The search employed by TSA was therefore adequate, and the Defendant should be granted summary judgment on this issue.

## II. THE WITHHOLDINGS BY TSA WERE PROPER.

TSA processed the responsive records in accordance with FOIA's requirements and withheld certain information in full or in part pursuant to the exemptions established by 5 U.S.C. § 552(b)(2), (b)(3), (b)(4), (b)(5), (b)(6), and (b)(7).  As explained above, the only withholdings at issue between the parties are those made pursuant to Exemption 3, Exemption 2 (high) (except for certain withholdings conceded by EPIC), Exemption 5, and two withholdings made under Exemption 4.  Janet Decl. ¶¶ 16-19.  As explained below and in the Declarations of Kevin J. Janet and Mark Roberts, because TSA properly invoked all exemptions and released to EPIC all information reasonably segregable from the exempt records, summary judgment should be granted to the Defendant.

### A.  TSA Properly Withheld Sensitive Security Information Specifically Exempted From Release By Statute Under Exemption 3.

Exemption 3 of FOIA permits an agency to withhold information that is:

specifically exempted from disclosure by statute . . . if that statute

(A) (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or
(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

(B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically
    cites to this paragraph.

5 U.S.C. § 552(b)(3).  TSA is authorized to withhold certain types of information under such a

statute.  Congress requires the TSA, "[n]otwithstanding section 552 of title 5 [i.e., the FOIA]," to

prescribe regulations prohibiting disclosure of information if the TSA Administrator "decides

that disclosing the information would (A) be an unwarranted invasion of personal privacy; (B)

reveal a trade secret or privileged or confidential commercial or financial information; or (C) be

detrimental to the security of transportation."  49 U.S.C. § 114(r).  Accordingly, TSA has

promulgated implementing regulations that expressly prohibit disclosure of certain categories of

"sensitive security information ("SSI").  See generally 49 C.F.R. part 1520.  Pursuant to these

regulations, there are fifteen specific types of information that constitute SSI, and TSA may also

designate other types of information as SSI.  See 49 C.F.R. § 1520.5(b).  As numerous courts,

including this Court, have found, 49 U.S.C. §§ 114(r), which explicitly indicates that it applies

"notwithstanding [the FOIA]," meets the criteria of Exemption 3 of FOIA.  See, e.g., Tooley v.

Bush, No. 06-306, 2006 WL 3783142, at *20 (D.D.C. Dec. 21, 2006), rev'd & remanded in part

on other grounds sub nom., Tooley v. Napolitano, 556 F.3d 836 (D.C. Cir. 2009); Elec. Privacy

Info. Ctr., 384 F. Supp. 2d at 110 n.10; Gordon v. F.B.I., 390 F. Supp. 2d 897, 900 (N.D. Cal.

2004).[3]

This Court's review of TSA's withholdings under Exemption 3 is extremely limited.

Specifically, "[w]hen analyzing whether the defendant is entitled to invoke Exemption 3, the

court need not examine the detailed factual contents of specific documents withheld; rather, the

sole issue for decision is the existence of a relevant statute and the inclusion of withheld material

---

[3] These courts cite to 49 U.S.C. § 114(s), which was subsequently redesignated as § 114(r) but
otherwise unchanged.  See Consolidated Appropriations Act, 2008, Pub.L. No. 110-161, 121
Stat. 1844, Div. E, § 568(a) (2007).

within the statute's coverage." <u>James Madison Project v. CIA</u>, 607 F. Supp. 2d 109, 126 (D.D.C.

2009) (internal quotation marks omitted).  Moreover, once this threshold requirement is met, the

Court lacks jurisdiction to review TSA's designation of the withheld information as SSI pursuant

to 49 U.S.C. § 46110.  <u>See</u> <u>Chowdhury v. Northwest Airlines Corp.</u>, 226 F.R.D. 608, 614 (N.D.

Cal. 2004); <u>see also</u> <u>Shqeirat v. U.S. Airways Group, Inc.</u>, No. 07-1513, 2008 WL 4232018, at

*2 (D. Minn. Sept. 9, 2008) ("District Courts are without jurisdiction to entertain challenges to

the TSA's decisions regarding disclosure of SSI.").  This statute provides that:

> . . . a person disclosing a substantial interest in an order issued by the Secretary of
> Transportation (or the Under Secretary of Transportation for Security with respect
> to security duties and powers designated to be carried out by the Under Secretary
> or the Administrator of the Federal Aviation Administration with respect to
> aviation duties and powers designated to be carried out by the Administrator) in
> whole or in part under this part, part B, or subsection (l) or (s)[4] of section 114
> may apply for review of the order by filing a petition for review in the United
> States Court of Appeals for the District of Columbia Circuit or in the court of
> appeals of the United States for the circuit in which the person resides or has its
> principal place of business . . .

49 U.S.C. § 46110(a).  It further provides that Courts of Appeals have "exclusive jurisdiction to

affirm, amend, modify or set aside" the final orders issued by TSA referenced in § 46110(a),

including SSI designations.  49 U.S.C. § 46110(c).  As such, District Courts may not review

orders of TSA designating material as SSI.  <u>See</u> <u>Gilmore v. Gonzales</u>, 435 F.3d 1125, 1133 (9th

Cir. 2006); <u>Merritt v. Shuttle, Inc.</u>, 245 F.3d 182, 187 (2d Cir. 2001); <u>Scherfen</u>, 2010 WL

456784, at *6; <u>Shqeirat</u>, 2008 WL 4232018, at *2; <u>In re September 11 Litigation</u>; 236 F.R.D.

164, 174-75 (S.D.N.Y. 2006); <u>Chowdhury</u>, 226 F.R.D. at 614.  A determination by TSA does not

---

[4] As indicated in the preceding footnote, § 114(s) is the subsection that formerly authorized TSA
to designate certain material as SSI; in 2007, this section was redesignated as § 114(r).  Section
46110(a) has not yet been updated to reflect this clerical change.  Courts that have discussed the
jurisdictional limitation of § 46110(a) since 2007 have recognized that it continues to apply to
orders designating material as SSI.  <u>See</u>, <u>e.g.</u>, <u>Scherfen v. U.S. Dep't of Homeland Sec.</u>, No.
3:CV-08-1554, 2010 WL 456784, at *6 (M.D. Pa. Feb. 2, 2010); <u>Shqeirat</u>, 2008 WL 4232018, at
*2.

require formal proceedings such as notice and comment to qualify as an "order" under § 46110.

See MacLean v. Dep't of Homeland Sec., 543 F.3d 1145, 1149 (9th Cir. 2008).

The import of 49 U.S.C. §§ 114(r) and 46110 is clear: TSA has the authority to designate material encompassed by the statute and its regulations as SSI notwithstanding the FOIA, and once TSA makes such a designation, the designated material is prohibited from disclosure and the designation is reviewable only via a petition for review filed in a court of appeals. The only question remaining, therefore, is "the inclusion of withheld material within the statute's coverage." James Madison Project, 607 F. Supp. 2d at 126. As described below and set forth in more detail in the Declaration of Mark Roberts, the Acting Manager of the Sensitive Security Information Branch of the TSA, all of the material withheld under Exemption 3 falls squarely 49 U.S.C. § 114(r) and its implementing regulations at 49 C.F.R. part 1520. Moreover, all of the material was withheld because, in TSA's judgment, its public release would be detrimental to the security of transportation. Roberts Decl. ¶ 9.

First, TSA has redacted excerpts from procurement specifications for AIT machines pursuant to 49 C.F.R. § 1520.5(b)(4)(i), under which SSI includes "[a]ny performance specification and any description of a test object or test procedure, for [a]ny device used by the Federal Government or any other person pursuant to any aviation or maritime transportation security requirements of Federal law for the detection of any person, and any weapon, explosive, incendiary, or destructive device, item, or substance." These redactions[5] all describe the "precise technical tolerance levels" required of AIT machines for detecting weapons, explosives, liquids, and other anomalies. Roberts Decl. ¶ 10. They are therefore within the scope of 49 C.F.R. § 1520.5(b)(4)(i); the specific items mentioned in the excerpts are either mentioned explicitly in

---

[5] Bates Nos. 000136, 000149, 000150, 001636, 001649, and 001650.

the regulation (weapons and explosives) or encompassed by the regulation's broader category of "incendiary, or destructive device, item, or substance" (liquids and other anomalies).  Id.

Second, TSA has redacted excerpts from two pages[6] of an "Operational Requirements" document.  Roberts Decl. ¶ 11.  This is a document from which performance specifications for AIT machines are derived, and defines the minimum requirements for the machines' ability to detect potential threats on a person.  Id.  The redacted excerpts are "functional and operational requirements as to the machines' settings regarding detection of threat items."  Id.  Accordingly, these requirements are performance specifications under 49 C.F.R. § 1520.5(b)(4)(i) and were properly redacted.  Id.

Third, TSA has withheld limited portions of TSA communications regarding customer complaints as SSI.[7]  These redactions are covered by regulations that include within the definition of SSI "[a]ny procedures, including selection criteria and any comments, instructions, and implementing guidance pertaining thereto, for screening of persons, accessible property, checked baggage, U.S. mail, stores, and cargo, that is conducted by the Federal government or any other authorized person."  49 C.F.R. § 1520.5(b)(9)(i).  All of the redacted excerpts consist of descriptions of specific security screening procedures deployed by TSA, and/or the reasons those procedures were used, in the specific instances described on the partially redacted pages.  See Roberts Decl. ¶ 13 (describing each redaction).  All of these portions accordingly constitute "procedure[s] . . . for screening of persons" conducted by TSA employees and were therefore properly designated as SSI under 49 C.F.R. § 1520.5(b)(9)(i).  Id.

---

[6] Bates Nos. 001733, 001752.
[7] Bates Nos. 000876, 000908, 000917-000918, 000920-000921, 000923-000924, 000935, and 001225.

Fourth, TSA has withheld excerpts of eight pages of questions and answers[8] from

"question trackers" concerning performance specifications for AIT machines.  See Roberts Decl.

¶¶ 14-15.  This document consists of questions about the machines' required specifications posed

by AIT vendors, along with the written responses provided at a later date by TSA.  Id. ¶ 14.

Because the redacted excerpts reference performance specifications, they fall within the scope of

49 C.F.R. §1502(b)(4)(i).  Id. ¶ 15.  In addition, some were also made under 49 C.F.R. §

1520.5(b)(9)(i) ("procedure[s] . . . for screening of persons"), and under § 1520.5(14)(ii), which

designates as SSI "[t]rade secret information, including information required or requested by

regulation or Security Directive, obtained by DHS or DOT in carrying out aviation or maritime

transportation security responsibilities."  See Roberts Decl. ¶ 15 (describing the specific redacted

excerpts and the precise rationale for each redaction).

Fifth, TSA has withheld, in full, 2,000 test images captured by AIT machines.  Roberts

Decl. ¶¶ 16-20.  These images were captured at a TSA test facility when the machines were on

test mode, and were taken using TSA models, not members of the public.  Janet Decl. ¶ 15.

When the machines are deployed at airports, they are not capable of storing images.  Id.  The test

images constitute SSI under 49 C.F.R. § 1520.5(b)(9)(vi), which includes as SSI "[a]ny

electronic image shown on any screening equipment monitor, including threat images and

descriptions of threat images for threat image projection systems."  Roberts Decl. ¶ 17.

Furthermore, these images were created to test the degree to which the AIT machines

manufactured by vendors conform to the detection standards set forth by TSA in its procurement

specifications.  Roberts Decl. ¶ 18.  Thus, they are also SSI under 49 C.F.R. § 1520(b)(9)(v),

which prohibits disclosure of "performance or testing data from security equipment or screening

systems."  Id.  Additionally, because many of these images were used for the purpose of training

---

[8] Bates Nos. 001702, 001703, 001710, 001714, 001716, 001718, 001719, and 001721.

TSA employees, they are also exempt under 29 C.F.R. § 1520.5(b)(10), which prohibits disclosure of "[r]ecords created or obtained for the purpose of training persons employed by, contracted with, or acting for the Federal government or another person to carry out aviation, maritime, or rail transportation security measures required or recommended by DHS or DOT." Roberts Decl. ¶ 19.

Finally, TSA has withheld, in full, 376 pages consisting of training manuals and instructor guides for AIT machines.  These manuals and guides were created by TSA and are intended to train aviation security personnel how to use the machines to properly screen passengers.  See Roberts Decl. ¶¶ 21-24.  These manuals and guides, in their entirety, constitute SSI under 49 C.F.R. § 1520.5(b)(10), which, as noted above, prohibits disclosure of "[r]ecords created or obtained for the purpose of training persons employed by, contracted with, or acting for the Federal government or another person to carry out aviation, maritime, or rail transportation security measures required or recommended by DHS or DOT." Id. ¶ 16. Additionally, the materials contain significant language from Security Screening Standard Operating Procedures (SOPs), as well as material "which, if released . . . would reveal . . . TSA's processes, routines, vulnerabilities, the types of materials for which TSA searches (and conversely, does not search), the locations of these materials, and the limitations on TSA's capabilities."  Roberts Decl. ¶ 23.  They are therefore also prohibited from disclosure under 49 C.F.R. § 1520.5(b)(9)(i), which, as mentioned above, includes as SSI "[a]ny procedures, including selection criteria and any comments, instructions, and implementing guidance pertaining thereto, for screening of persons, accessible property, checked baggage, U.S. mail, stores, and cargo, that is conducted by the Federal government or any other authorized person."

Id.  Finally, the materials include dozens of pages of electronic AIT images, which, as discussed

above, are SSI under 49 C.F.R. § 1520.5(b)(9)(v), (b)(9)(vi), and (b)(10).  Id. ¶ 22.

The Roberts Declaration affirmatively shows that all of the withholdings made pursuant

to Exemption 3 fell within the definition of SSI under 49 U.S.C. §§ 114(r), as implemented by 49

C.F.R. part 1520.  The withholdings were therefore proper.  To the extent that EPIC wishes to

challenge TSA's designation of these records as SSI, its recourse is to file a petition for review in

a court of appeals, as this Court lacks jurisdiction to consider the issue.

### B. TSA Properly Withheld Material Under Exemption 2.

FOIA Exemption 2 exempts from release information "related solely to the internal

personnel rules and practices of an agency."  5 U.S.C. § 552(b)(2).  This applies to materials

"used for predominantly internal purposes," Schiller v. NLRB, 964 F.2d 1205, 1207 (D.C. Cir.

1992) (quoting Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051, 1073 (D.C.

Cir. 1981) (en banc)), and not merely those concerning personnel, see Founding Church of

Scientology of Washington, D.C. v. Smith, 721 F.2d 828, 830 & n.2 (D.C. Cir. 1983); Judicial

Watch, Inc. v. U.S. Dep't of Transp, No. Civ. 02-566-SBC, 2005 WL 1606915, at *9 (D.D.C.

July 7, 2005).  There are two categories of "predominantly internal" information protected by

Exemption 2: "low 2" information that pertains to "routine matters of merely internal interest,"

Crooker, 670 F.2d at 1069, and "high 2" information that, if released, would "risk[]

circumvention of agency regulations or statutes,"  id. at 1074.

The only Exemption 2 withholdings at issue between the parties are certain withholdings

made pursuant to Exemption "high 2."  This exemption protects information that is

"predominantly internal" and would "risk[] circumvention of agency regulations or statutes,"

Crooker, 670 F.2d at 1073-74.  Courts have commonly upheld agencies' use of this exemption to

withhold information where, as here, the information would compromise law enforcement and homeland security measures by revealing ways in which those measures could be circumvented or evaded.  See, e.g., Crooker, 670 F.2d at 1073 (manual containing "law enforcement investigative techniques"); Gordon v. FBI, 388 F. Supp. 2d 1028, 1035-36 (N.D. Cal. 2005) (details of FBI's aviation watch list program, including records detailing how individuals were selected for the lists); Judicial Watch, Inc., 2005 WL 1606915, at *9 (storage locations of explosives-detection equipment for aviation security); Schwarz v. U.S. Dep't of Treasury, 131 F. Supp. 2d 142, 150 (D.D.C. 2000) (characteristics used by Secret Service to evaluate a subject's dangerousness); Miller v. DOJ, No. 87-0533, 1989 WL 10598, at *1-2 (D.D.C. Jan. 31, 1989) (sections of Bureau of Prisons manual summarizing procedures for prison security).

DHS and TSA have withheld a number of records under the "high 2" exemption.  The vast majority of these records were also withheld as SSI under Exemption 3.  Janet Decl. ¶ 35. [9] These withholdings would therefore be proper even if the Court were to find "high 2" inapplicable, but they, as well as the four withholdings made exclusively under "high 2," are also supportable under 5 U.S.C. § 552(b)(2).

There are six broad categories of "high 2" withholdings in this case:

(1) Excerpts from procurement specifications describing the required capabilities of WBI machines for detecting weapons, explosives, liquids, and other anomalies,[10] (2) Excerpts from operational requirements documents that describe certain functional requirements,[11] (3) Excerpts from TSA communications that identify specific security screening procedures and techniques,[12] (4) Excerpts from the "question trackers" that describe certain performance specifications,[13] (5) the 2000 test images produced by IAT machines

---

[9] The only excerpts withheld under Exemption "high 2" that are not also being withheld under Exemption 3 are at Bates Nos. 000896, 000907, 001637, and 001640.  See Janet Decl. ¶ 35 & n.8.

[10] Bates Nos. 000136, 000149, 000150, 001636, 001637, 001640, 001649, 001650.

[11] Bates Nos. 001733, 001752.

[12] Bates Nos. 000876, 000896, 000907, 000908, 000917, 000918, 000920, 000921, 000923, 000924, 000935, 001225.

[13] Bates Nos. 001702, 001703, 001710, 001714, 001716, 001718, 001719, 001721.

> that have not been deployed at airports, withheld in their entirety and (6) the training
> materials, withheld in their entirety.

Janet Decl. ¶ 34.  All of these documents are "predominantly internal," that is, they are "designed

to establish rules and practices for agency personnel" and "involve[] no 'secret law' of the

agency."  Crooker, 670 F.2d at 1073.  The documents withheld under this exemption are either

solely internal and have not left the agency at all – such as internal emails and training materials

– or have been circulated outside TSA in a very limited fashion and are still predominantly

internal.  Janet Decl. ¶ 36.  The performance specifications, operational requirements, and

question trackers have been provided only to vendors who either already held contracts with

TSA and accordingly were cleared and granted access to sensitive security information, or

vendors who, although they did not yet hold contracts, were cleared by TSA to have access to

sensitive security and/or classified information and who executed nondisclosure agreements with

TSA.  Janet Decl. ¶ 36; Roberts Decl. ¶¶ 12, 14.[14]  These documents are therefore predominantly

internal, as the limited sharing of records outside of a federal agency for official purposes does

not remove them from the scope of Exemption 2.  See Milner v. U.S. Dep't of the Navy, 575

F.3d 959, 968-69 (9th Cir. 2009) (finding that documents disclosed by federal agencies to state

and local emergency responders were still predominantly internal, noting that "[s]uch

cooperation encourages coordinated and effective mutual aid that improves safety for both

government employees and citizens"); Los Angeles Times Commc'ns, LLC v. Dep't of Army,

442 F. Supp. 2d 880, 901 (C.D. Cal. 2006) (finding that limited distribution of information to

private contractors "does not negate th[e] fact" that information was "compiled for

predominantly internal purposes"); Judicial Watch, 2005 WL 1606915, at *9 (finding that

---

[14] Although the Roberts declaration was provided to support designations of SSI under
Exemption 3, the facts cited here support the "high 2" redactions of those documents as well, as
the rationale justifying these records' designation as SSI – detriment to transportation security –
is the same rationale for withholding the records under "high 2."  Janet Decl. ¶ 37.

records "created in furtherance of work assigned to FAA contractors and . . . used internally by FAA" were predominantly internal).  The same rationale applies to an excerpt from a communication[15] from a TSA employee to an individual passenger; the information redacted – a description of TSA's reason for employing a particular screening technique – is predominantly internal because it was not widely disseminated to the public.  Roberts Decl. ¶ 13; Janet Decl. ¶ 36.

The withheld excerpts and documents all meet the other requirement of "high 2," as their release would "risk[] circumvention of agency regulations or statutes," and indeed jeopardize the safety of the traveling public.  Release of the first redacted category, specifications of the machines' capabilities for detecting weapons, explosives, liquids, and other anomalies, would enable individuals to attempt to circumvent the machines as this information, by implication, implicitly identifies items that the machines are <u>not</u> required to, and may not, detect.  Roberts Decl. ¶ 10; Janet Decl. ¶¶ 37, 40.  Similarly, the second category, descriptions of certain functional requirements to detect threat items, would reveal these limitations, which could then be exploited. Roberts Decl. ¶ 11; Janet Decl. ¶ 37.  The third category includes communications that describe specific screening techniques used by TSA personnel.  As noted <u>supra</u>, most of these communications were designated SSI pursuant to 49 C.F.R. § 1520.5(b)(9)(i).[16]  Other such communications, although they did not meet the criteria for prohibited disclosure under the SSI regulations, were withheld under Exemption "high 2."  Janet Decl. ¶ 39.[17]  With regard to all of these withholdings, however, knowledge of the techniques mentioned in the withheld excerpts, and when, how, and why they are employed, would facilitate the circumvention of

---

[15] Bates No. 001225.
[16] Bates Nos. 000876, 000908, 000917, 000918, 000920, 000921, 000923, 000924, 000935, 001225.
[17] Bates Nos. 000896, 000907.

those techniques by those intent on evading them.  Roberts Decl. ¶ 13; Janet Decl. ¶¶ 37, 39.

The fourth category includes excerpts from the "question tracker" that documents questions

posed by AIT vendors and the responses by TSA.  As explained above, each of these questions

and answers discusses and references the machines' required abilities and limitations regarding

the detection of explosives and other threat objects.  Roberts Decl. ¶ 15.  A terrorist intent on

circumventing the machines and TSA's screening procedures would therefore learn valuable

information that he or she could use to exploit the machines or procedures.  Id.  Regarding the

fifth category, the test images, these images reveal the types of objects typically searched for (or

not searched for) for by TSA officials, as well as AIT machines' detection capabilities and

limitations for each object.  Accordingly, the images, if released, would reveal certain security

vulnerabilities of the machines themselves, as well as searching and screening techniques

employed by TSA.  Id. ¶ 17.

Finally, the training materials withheld in their entirety are also covered by the "high 2"

exemption.  First, they contain several of the images that themselves are exempt from disclosure.

Id. ¶ 22.  Second, the materials contain "discussions devoted to image interpretation, image

anomalies and communication protocols which, if released to the public, would reveal, among

other things, TSA's processes, routines, vulnerabilities, the types of materials for which TSA

searches (and conversely, does not search), the locations of those materials, and the limitations

on TSA's capabilities."  Id. ¶ 23 (emphasis in original).  Finally, after the materials were

reviewed by the TSA Acting Administrator in light of current intelligence, it was determined that

release of these documents – or even any excerpts of these documents – would pose too great a

threat to aviation security if released.  Id.  ¶ 24; see also Janet Decl. ¶ 37.

Accordingly, all redactions under Exemption "high 2" were proper.  All but 4 of these redactions were also properly made under Exemption 3, and all of the redactions are supportable under Exemption "high 2" as well.

**C. TSA Properly Withheld Material Under Exemption 4.**

TSA also withheld certain confidential commercial information pursuant to FOIA Exemption 4, which protects records from disclosure that contain "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4).  Private commercial information that has been submitted to the government under compulsion is "confidential" for purposes of Exemption 4 if disclosure is likely either "(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained."  Nat'l Parks & Conservation Ass'n v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974).  If private commercial information is provided to the government voluntarily, it is confidential for purposes of Exemption 4 "if it is of a kind that would customarily not be released to the public by the person from whom it was obtained."  Critical Mass Energy Project v. Nuclear Regulatory Comm'n, 975 F.2d 871, 879 (D.C. Cir. 1992).

As explained above, see supra n. 2, EPIC and TSA have agreed that the majority of the withholdings made pursuant to Exemption 4 were proper and they are accordingly not at issue in this case.  However, the records released to EPIC included two Exemption 4 withholdings outside the scope of that agreement.  These withholdings are two questions from the "question tracker" document in which vendors revealed proprietary information in questions posed to TSA. Janet Decl. ¶¶ 42-44.[18]  The information referenced in the questions was information that was required to be submitted by the vendors as a prerequisite to their ability to compete for contracts

_____

[18] Bates No. 001715.

for AIT machines.  Id. ¶ 44.  Moreover, TSA concluded that the public disclosure of this

information was likely to cause substantial harm to the vendors' competitive positions, and to

impair the Government's ability to obtain such information in the future.  Id.  Accordingly, the

two Exemption 4 redactions were proper.

> **D. TSA Properly Withheld Privileged Material Under Exemption 5.**

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums

or letters which would not be available by law to a party other than an agency in litigation with

the agency."  5 U.S.C. § 552(b)(5).  These records are exempt from disclosure if they would be

"normally privileged in the civil discovery context."  NLRB v. Sears, Roebuck & Co., 421 U.S.

132, 149 (1975).  Exemption 5 thus incorporates the privileges that are available to an agency in

civil litigation, the three principal ones being the deliberative process privilege, the attorney-

client privilege, and the attorney work product doctrine.  See id. at 148-49.

The deliberative process privilege protects internal communications that are "both

predecisional and deliberative."  Mapother v. Dep't of Justice, 3 F.3d 1533, 1537 (D.C. Cir.

1993).  Accordingly, it applies to "recommendations, draft documents, proposals, suggestions,

and other subjective documents which reflect the personal opinions of the writer rather than the

policy of the agency."  Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C.

Cir. 1980). The purpose of this privilege is to encourage frank discussion of legal and policy

issues within the government, and to protect against public confusion resulting from disclosure

of reasons and rationales that were not ultimately the bases for the agency's action.  See, e.g.,

Dep't of the Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8-9 (2001) (internal

citations omitted) (noting that the privilege "rests on the obvious realization that officials will not

communicate candidly among themselves if each remark is a potential item of discovery and

front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government").

TSA withheld a limited number of document excerpts on the basis of the deliberative process privilege. Janet Decl. ¶ 47.[19]  All but two of these excerpts are from internal agency emails and other communications that were prepared to determine how best to respond to passenger complaints. Id. ¶¶ 47-57.  These materials are pre-decisional because they were "prepared in order to assist an agency decisionmaker in arriving at his decision," Quarles v. Dep't of the Navy, 893 F.2d 390, 392 (D.C. Cir. 1990); Mapother, 3 F.3d at 1537, namely, how to address the complaints or how to take corrective measures at security checkpoints. Id. ¶ 47. They are deliberative in that they reflect opinions and recommendations of their authors and are part of the normal give-and-take that precedes an agency decision. See Access Reports v. Dep't of Justice, 926 F.2d 1192, 1195 (D.C. Cir. 1991) (citing Coastal States, 617 F.2d at 866); see also Sears, 421 U.S. at 150 (documents "reflecting . . . deliberations comprising part of a process by which governmental decisions . . . are formulated" are deliberative).  Descriptions of the specific redactions, and the reasons for the withholdings, are set forth in the Janet Declaration, paragraphs 48-57.  See, e.g., Janet Decl. ¶¶ 50 (describing a sentence in which an author of an interoffice memorandum offers his personal opinions on the merits of a complaint), 54 (describing an exchange between a Deputy Assistant Federal Security Director and a Transportation Security Manager in which they discuss factual discrepancies in an incident report documenting a complaint).  In addition, two redactions were made of handwritten notes in which TSA officials made recommendations regarding the application of FOIA exemptions to

---

[19] Bates Nos. 000268, 000888, 0000891, 000892, 000912, 000919, 001054, 001055, 001060, 001061, 001065, 001079, 001083, 001086, 001088, 001092, 001100, 001107, 001119, 001124, 001145, and 001148.  Some of these withholdings were also covered by the attorney-client privilege.  Janet Decl. ¶ 53 & n. 10.

the documents on which the notes were made.  Janet Decl. ¶ 58.  These documents, too, are pre-decisional in that a final decision regarding exemptions had not yet been made, and deliberative in that they reflected recommendations.  Id.

TSA also withheld certain material protected by the attorney-client privilege.  Janet Decl. ¶ 60.[20]  This privilege protects confidential communications made between clients and their attorneys for the purpose of securing legal advice or services.  See In re Sealed Case, 737 F.2d 94, 98–99 (D.C. Cir. 1984).  Like a private client, a government agency "needs . . . assurance of confidentiality so it will not be deterred from full and frank communications with its counselors."  Coastal States, 617 F.2d at 863.  As outlined in the Janet Declaration, TSA redacted limited portions of internal emails because they constituted confidential communications between TSA attorneys and agency officials in which the agency officials "seek, and receive, the attorneys' legal advice as to how to handle passenger complaints as they sought both to resolve the complaints and prepare to deal with any anticipated legal claims."  Janet Decl. ¶¶ 60-66.  These redactions were accordingly proper.

Finally, TSA made three redactions pursuant to the attorney work product doctrine.  This doctrine protects materials prepared by an attorney in "in anticipation of foreseeable litigation, even if no specific claim is contemplated."  Schiller, 964 F.2d at 1208.  Its purpose is "to protect the adversarial trial process by insulating the attorney's preparation from scrutiny."  James Madison Project, 607 F. Supp. 2d at 129.  Here, TSA withheld three excerpts pursuant to the work product doctrine, two of which are also covered by the attorney-client privilege.  Janet

---

[20] Bates Nos. 001054, 001079, 001083, 001086, 001087, 001088, 001090, 001092, 001095, 001098, 001100, 001107, 001119.  As the Janet Declaration indicates, some of these withholdings are also covered by the deliberative process privilege, while some others are also covered by the attorney work product doctrine.  Janet Decl. ¶ 60 n. 11.

Decl. ¶¶ 67-69.[21]   As the Janet Declaration shows, all three excerpts reflect work done by TSA attorneys in anticipation of litigation and are therefore encompassed by the work product doctrine and protected from disclosure under Exemption 5.

**E. TSA Produced All Reasonably Segregable Information.**

Under FOIA, "any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  Accordingly, "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." Mead Data Central, Inc. v. U.S. Dept. of Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977).  A court "may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated." Juarez v. Dep't of Justice, 518 F.3d 54, 61 (D.C. Cir. 2008) (internal citation omitted).

As detailed in the Janet and Roberts declarations, the majority of the withholdings at issue in this case have been withholdings of limited excerpts of documents – individual paragraphs, sentences, or phrases on 58 pages.  Janet Decl. ¶ 71.  These documents have been produced to EPIC in redacted form.  On each partially redacted document, TSA produced the segregable portion of each document, and marked the redactions with the applicable exemption. Id. ¶ 70.  All non-exempt responsive records that were located were provided to Plaintiff.  Id.  No further segregation of these records was possible.  Id. ¶ 71.

There are only two categories of documents in which TSA withheld records in full.  One category is the set of 2,000 test images, which was withheld in full under Exemption 3 and Exemption 2 (high).  As outlined in the Roberts Declaration, "[n]o aspect of the images is segregable because each image contains various threat objects dispersed throughout the bodies

---

[21] Bates Nos. 000979, 001087, 001098.

reflected on those images." Roberts Decl. ¶ 20 (emphasis added). Additionally, TSA could not release any of the test images because the images' value comes from their ability to be compared and contrasted with other images. Id. ¶ 17. Thus, "an image considered for protection or release must not be examined solely for a potential detrimental effect of that single image, but must be considered in the context of a terrorist or criminal comparing that image to other images." Id. Because TSA has released a limited number of AIT images to the public, it determined that in this case, "any further release of images would constitute a threat to transportation security because it would enable terrorists, by comparing and contrasting more images, to determine AIT machines' (and TSA's) detection capabilities and limitations." Id. Accordingly, each image was exempt from disclosure and no portions were segregable.

In addition, TSA withheld in full, under Exemption 3 and Exemption 2 (high), all records responsive to item 4 of the July 2 Request, namely, training materials. As the Roberts Declaration explains, these documents were withheld in full for a number of reasons. First, they were, in their entirety, prohibited from disclosure as training records for aviation security under 49 U.S.C. § 114(r) and 49 C.F.R. § 1520.5(b)(10). Roberts Decl. ¶ 22. Second, "woven throughout" the documents are materials that are covered by 49 C.F.R. §§ 1520.5(b)(9)(i), (b)(v), and (b)(vi). Id. ¶ 23. Finally, after TSA conducted "a line by line review" in "an effort to segregate Sensitive Security Information . . . from conceivably non-sensitive language," upon review, the TSA Acting Administrator, "reviewing the materials through the prism of current intelligence and under the current threat environment, determined that segregation was simply not possible" because the risk of inadvertent disclosure of information that could compromise aviation security was too great. Id. ¶ 24. TSA also determined that any clearly non-exempt information was "so inextricably intertwined with the exempt information that release of the

nonexempt information" would produce meaningless fragments, words, and phrases.  Id.  For

these reasons, these documents were withheld in full and could not be produced in redacted

form.

## **CONCLUSION**

Because DHS and TSA have conducted an adequate search and produced all non-exempt

responsive documents to EPIC, and because no further segregation of non-exempt responsive

documents is possible, summary judgment should be granted to the Defendant.


Date: May 27, 2010                              Respectfully submitted,

                                                TONY WEST
                                                Assistant Attorney General

                                                RONALD S. MACHEN JR.
                                                United States Attorney for
                                                the District of Columbia

                                                ELIZABETH J. SHAPIRO
                                                Deputy Branch Director


                                                 /s/ Jesse Z. Grauman
                                                JESSE Z. GRAUMAN (Va. Bar No. 76782)
                                                U.S. Department of Justice
                                                Civil Division, Federal Programs Branch

                                                Mailing Address:
                                                Post Office Box 883
                                                Washington, D.C.  20044

                                                Courier Address:
                                                20 Massachusetts Ave., N.W.
                                                Washington, D.C. 20001

                                                Telephone:     (202) 514-2849
                                                Fax:           (202) 616-8460
                                                Email:         jesse.z.grauman@usdoj.gov

                                                Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

ELECTRONIC PRIVACY INFORMATION CENTER,

        Plaintiff,

      v.

THE UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,

        Defendant.

_____

Case No. 1:09-cv-02084 (RMU)

## <u>DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE</u>

Pursuant to Local Civil Rule 7(h) of the Rules of the United States District Court for the District of Columbia, Defendant United States Department of Homeland Security ("DHS") hereby submits the following statement of material facts as to which the defendant contends there is no genuine issue in connection with its motion for summary judgment under Rule 56(b) of the Federal Rules of Civil Procedure. Where appropriate, the statement cites to the Declaration of Kevin J. Janet ("Janet Decl.") and exhibits thereto, and the Declaration of Mark Roberts ("Roberts Decl.").

1. On April 14, 2009, Plaintiff, the Electronic Privacy Information Center ("EPIC"), submitted a request under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), to DHS, seeking agency records relating to the deployment by DHS's component, the Transportation Security Agency ("TSA"), of certain airport screening technology. Specifically, this request (the "April 14 Request") sought:

    1. All documents concerning the capability of passenger imaging technology to obscure,

degrade, store, transmit, reproduce, retain, or delete images of individuals;

2. All contracts that include provisions concerning the capability of passenger imaging technology to obscure, degrade, store, transmit, reproduce, retain, or delete images of individuals; and

3. All instructions, policies, and/or procedures concerning the capability of passenger imaging technology to obscure, degrade, store, transmit, reproduce, retain, or delete images of individuals.

Declaration of Kevin J. Janet ("Janet Decl.") ¶ 4 & Ex. A.  EPIC requested expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E), and requested preferential fee status as a "representative of the news media" pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II).  Id.  On April 27, 2009, DHS transferred the requests to its component, the TSA, which DHS determined would be likely to have the responsive records.  Id. ¶ 4.

2. On July 2, 2009, EPIC submitted a second FOIA request to DHS (the "July 2 Request"), requesting:

1. All unfiltered or unobscured images captured using Whole Body Imaging Technology.

2. All contracts entered into by DHS pertaining to Whole Body Imaging systems, including contracts for hardware, software, or training.

3. All documents detailing the technical specifications of Whole Body Imaging hardware, including any limitations on image capture, storage, or copying.

4. All documents, including, but not limited to, presentations, images, and videos, used for training persons to use Whole Body Imaging systems.

5. All complaints related to the use of Whole Body Imaging and all documents relating to the resolution of those complaints.

6. All documents concerning data breaches of images generated by Whole Body Imaging technology.

Janet Decl. ¶ 7 & Ex. C.  EPIC again requested expedited processing and "news media" fee status.  Id.  DHS again transferred the request to TSA.  Id.

3. On or about May 4, 2009, TSA and EPIC agreed to narrow the scope of the second item in the April 14 Request to avoid a lengthy process wherein TSA would have had to consider contractors' claims of confidential business information.  Janet Decl. ¶ 6.  On March 3, 2010, TSA and EPIC came to four additional agreements to narrow the scope of the two requests.  Id. ¶ 12 & Ex. G.

4. On November 5, 2009, EPIC filed an action in this Court, No. 1:09cv2084 (RMU) ("EPIC v. DHS I"), alleging that DHS had violated FOIA by failing to respond to the April 14 Request within the required statutory time period, and asking that the Court order DHS to produce the requested documents, adjudicate EPIC's request for "news media" fee status, and order that all fees be waived.  On January 13, 2010, EPIC filed a second action in this Court, 1:10cv63 (CKK) ("EPIC v. DHS II"), alleging that that DHS had violated FOIA with regard to the July 2 Request by failing to respond within the required statutory time period and seeking similar relief.  These two actions were consolidated into EPIC v. DHS I on March 17, 2010, when the Court granted the parties' joint motion that was filed on March 11, 2010 (Dkt. No. 16).

5. On December 1, 2009, TSA produced an interim response to the April 14 Request. Janet Decl. ¶ 9 & Ex. E.  Under an agreed-upon schedule (Dkt. No. 15), TSA, which began to treat the two requests as one due to their overlapping subject matter, made three additional, consolidated document productions responsive to both requests on March 2, 2010, March 15, 2010, and April 15, 2010.  Janet Decl. ¶¶ 11, 13, 14 & Exs. F, H, I.

6. Pursuant to TSA's letter of March 15, 2010, all fees have been waived for EPIC with regard to the two requests.  Janet Decl. ¶ 13 & Ex. H.  Accordingly, EPIC's request for "news media" fee status is no longer at issue.

7. In total, TSA produced 1,766 pages of documents in response to EPIC's two requests. Janet Decl. ¶ 15.  Excerpts of many of these pages were withheld in part was withheld pursuant to the exemptions established by 5 U.S.C. § 552(b)(2), (b)(3), (b)(4), (b)(5), (b)(6), and (b)(7). Id.  In addition, TSA withheld, in full, 2,000 test images and 376 pages of TSA training materials.  Id.

8. On May 18, 2010, after TSA shared a draft <u>Vaughn</u> index with EPIC, EPIC agreed not to contest the following withholdings by TSA:

(1) All withholdings of confidential business information pursuant to Exemption 4, as well as any withholdings of similar information deemed outside the scope of EPIC's requests pursuant to the May 4, 2009 phone agreement;
(2) All withholdings of names, phone numbers, email addresses, IP addresses, ID numbers, and similar trivial and/or personally identifying information, for both government and non-government individuals, made pursuant to Exemptions 2, 6, and 7; and
(3) The withholding of two excerpts pertaining to "mean downtime requirements," made pursuant to Exemption 2 (high).

Janet Decl. ¶ 16 & Ex J.

9. Subsequent to the May 18 agreement, TSA recognized that it had inadvertently omitted ten partial withholdings from the draft <u>Vaughn</u> index it had shared with EPIC on May 18.  TSA informed EPIC of the omission and stated that it would construe any omitted withholdings as outside the scope of the May 18 agreement.  Janet Decl. ¶ 17 & Ex. K.

10. As a result of the May 18 agreement, the only withholdings that remain at issue between the parties are:

(1)    All withholdings made pursuant to Exemption 3;
(2)    All withholdings made pursuant to Exemption 2 (high) except those covered by the May 18 agreement;
(3)    All withholdings made pursuant to Exemption 5; and
(4)    Two withholdings made pursuant to Exemption 4 that were outside the scope of the May 18 agreement.

Janet Decl. ¶¶ 16-19.

11.   Upon reviewing the records produced in preparation of the instant motion, TSA
determined that eight redactions made pursuant to Exemption 2 (high) had been erroneously
made, and produced the documents to EPIC without the erroneous withholdings on May 27,
2010.  Janet Decl. ¶ 18 & Ex. L.

12. To locate the responsive documents, the TSA conducted an extensive search,
including manual and electronic searches, that included the DHS Transportation Security
Laboratory, and TSA's Office of Security Technology, Office of Acquisitions, Office of
Operational and Technical Training, TSA Contact Center, Office of Legislative Affairs, Privacy
Office, and the Federal Security Director Offices for those airports using WBI technology.  Janet
Declaration ¶¶ 20-29.

13. The Declarations of Kevin J. Janet, TSA's FOIA Officer, and Mark Roberts, the
Acting Manager  of TSA's Sensitive Security Information (SSI) Branch, set forth the details of
the scope of TSA's search, as well as the grounds for all of TSA's withholdings pursuant to the
FOIA Exemptions at issue between the parties.


Date: May 27, 2010                              Respectfully submitted,

                                                TONY WEST
                                                Assistant Attorney General

                                                RONALD S. MACHEN JR.
                                                United States Attorney for
                                                the District of Columbia

                                                ELIZABETH J. SHAPIRO
                                                Deputy Branch Director


                                                 /s/ Jesse Z. Grauman
                                                JESSE Z. GRAUMAN (Va. Bar No. 76782)

U.S. Department of Justice
Civil Division, Federal Programs Branch

<u>Mailing Address:</u>
Post Office Box 883
Washington, D.C.  20044

<u>Courier Address:</u>
20 Massachusetts Ave., N.W.
Washington, D.C. 20001

Telephone:      (202) 514-2849
Fax:            (202) 616-8460
Email:          jesse.z.grauman@usdoj.gov

Attorneys for Defendants